# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 1, 2015        Decided October 23, 2015

No. 14-5194

AMIR MESHAL,
APPELLANT

v.

CHRIS HIGGENBOTHAM, FBI SUPERVISING SPECIAL AGENT, IN
HIS INDIVIDUAL CAPACITY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-02178)

———

*Jonathan Hafetz* argued the cause for appellant. With
him on the briefs were *Arthur B. Spitzer* and *Hina Shamsi*.

*William J. Aceves* was on the brief for *amici curiae* U.N.
Special Rapporteurs on Torture in support of appellant.

*Jessica Ring Amunson* was on the brief for *amici curiae*
Law Professors James E. Pfander, Carlos M. Vázquez, and
Stephen I. Vladeck in support of appellant.

*James J. Benjamin*, *Jr.* and *Christopher M. Egleson* were on the brief for *amicus curiae* Donald Borelli in support of appellant.

*Agnieszka M. Fryszman* was on the brief as *amicus curiae* The Constitution Project in support of appellant.

*Henry C. Whitaker*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Matthew M. Collette* and *Mary H. Mason*, Attorneys.

Before: BROWN, KAVANAUGH and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

Dissenting opinion filed by *Circuit Judge* PILLARD.

BROWN, *Circuit Judge*: Amir Meshal filed this *Bivens* action, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), against several agents of the Federal Bureau of Investigation ("FBI"), claiming they violated his Fourth and Fifth Amendment rights when they detained, interrogated, and tortured him over the course of four months in three African countries. Meshal insists a *Bivens* remedy in these circumstances is necessary and unexceptional. The government condemns the pro-*Bivens* rationale applied extraterritorially as unprecedented. The district court found the allegations of federal agents abusing an American citizen abroad quite troubling. So do we. Still,

the district court dismissed Meshal's suit, finding a *Bivens* action unavailable.

Faced with a shifting paradigm in which counterterrorism and criminal investigation merge, we rely on a familiar framework in an unconventional context. No court has countenanced a *Bivens* action in a case involving the national security and foreign policy context. And, while *Bivens* remedies for ill-executed criminal investigations are common, extraterritorial application is virtually unknown. We hold that in this particular new setting—where the agents' actions took place during a terrorism investigation *and* those actions occurred overseas—special factors counsel hesitation in recognizing a *Bivens* action for money damages.

I

Meshal, a United States citizen and New Jersey resident, traveled to Mogadishu, Somalia in 2006 to "broaden his understanding of Islam after the country's volatile political situation had largely stabilized."[1] J.A. 15. While he was visiting the country, violence erupted, forcing Meshal to flee to Kenya along with other civilians.

In January 2007, Meshal was apprehended by Kenyan authorities, in a joint U.S.-Kenyan-Ethiopian operation, and transported to Nairobi. A member of Kenya's Criminal Investigation Department ("CID") told Meshal that authorities needed to determine "what the United States wanted to do

---

[1] When reviewing whether the district court properly granted a motion to dismiss, we assume the truth of all well-pleaded factual allegations in the complaint. *Doe v. Rumsfeld*, 683 F.3d 390, 391 (D.C. Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

with him" before sending him "back to the United States." J.A. 31.

Sometime between January 27 and February 3, 2007, U.S. officials learned about Meshal's detention in Kenya and thus began a lengthy, multi-jurisdictional interrogation in which Defendants Chris Higgenbotham, Steve Hersem, John Doe 1, and John Doe 2 (collectively "Defendants") had significant roles. Meshal claims Defendants followed the procedures detailing how the FBI should "conduct investigations abroad, participate with foreign officials in investigations abroad, or otherwise conduct activities outside the United States with the written [acquiescence or approval] of the Director of Central Intelligence and the Attorney General or their designees." J.A. 32 (citing THE ATTORNEY GENERAL'S GUIDELINES FOR FBI NATIONAL SECURITY INVESTIGATIONS AND FOREIGN INTELLIGENCE COLLECTION 17 (Oct. 31, 2003) (declassified Aug. 2, 2007)).

For the next four months, Meshal claims Defendants detained him in secret, denied him access to counsel and the courts, and threatened him with torture and death. He says he was threatened with extradition to Israel where the Israelis would "make [Meshal] disappear," J.A. 41; and with rendition to Egypt, where they "had ways of making him talk," J.A. 42. Defendant Hersem also intimated that Meshal would suffer the same fate as the protagonist in the movie *Midnight Express*[2]—a movie where a foreign prisoner is brutally beaten and confined in horrid conditions in a Turkish prison for refusing to cooperate. Hersem said, "You made it so that even your grandkids are going to be affected by what you did," but promised that if Meshal confessed his connection to al Qaeda, he would be returned to the United States to face

---

[2] *See* MIDNIGHT EXPRESS (Columbia Pictures 1978).

civilian courts instead of being returned to Somalia. J.A. 41. Meshal believes the agents hoped to extract a confession to terrorist activity as a prelude to prosecution. The alleged threats had an effect; Meshal's cellmate observed that Meshal was "extremely distressed and crying" after returning to his cell from one of the interrogations. J.A. 41.

Meshal also alleges he was transferred between three African countries without legal process: from Kenya to Somalia, where he was detained in handcuffs in an underground room, with no windows or toilets, a place referred to as "the cave," J.A. 48–49; then flown blindfolded to Addis Ababa, Ethiopia, where he was detained in a military barracks. Over the next three months, Ethiopian officials regularly transported Meshal and other prisoners to a villa for interrogation where Does 1 and 2 repeatedly refused Meshal's requests to speak to a lawyer. When he was not being interrogated, Meshal was handcuffed in his prison cell, and spent several days in solitary confinement.

Eventually, the FBI released Meshal, and he returned to the United States. During the four months he was detained abroad, he lost approximately eighty pounds. He was never charged with a crime.

Meshal filed a *Bivens* action specifically alleging detention without a hearing for four months violated his Fourth Amendment rights and that the threats of torture and disappearance violated his due process rights. In deciding Defendants' motion to dismiss, the district court found Meshal had properly stated Fourth and Fifth Amendment claims.[3] Yet the court dismissed the case, concluding a *Bivens*

---

[3] Meshal pled additional Fifth Amendment claims that the district court did not address. Those claims related to his "prolonged

action was unavailable to Meshal because both this court, and several other circuits, had "expressly rejected a *Bivens* remedy for [U.S.] citizens who allege they have been mistreated, and even tortured, by [American officials] in the name of intelligence gathering, national security, or military affairs." *Meshal v. Higgenbotham*, 47 F. Supp. 3d 115, 116–17 (D.D.C. 2014).

II

A

Federal tort causes of action are ordinarily created by Congress, not by the courts. Congress has created numerous tort causes of action allowing plaintiffs to recover for tortious acts by federal officers. *See, e.g.*, Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*; Torture Victim Protection Act, 28 U.S.C. § 1350 Note. But Congress has not created a tort cause of action that applies to this case. The Federal Tort Claims Act, for example, explicitly exempts claims against federal officers for acts occurring in a foreign country. *See* 28 U.S.C. § 2680(k). The Torture Victim Protection Act provides a cause of action only against foreign officials, not U.S. officials. *See* 28 U.S.C. § 1350 Note, § 2(a). Having no statutory cause of action, Meshal has sued directly under the Constitution, relying on the Supreme Court's decision in *Bivens*.

---

extrajudicial detention and his forcible rendition to two dangerous situations." Br. of Appellant at 20 n.4, Meshal v. Higgenbotham, No. 14-5194 (D.C. Cir. Dec. 15, 2014). We need not discuss these additional claims, which were raised only in a footnote in Meshal's initial brief. *See Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999).

In 1971, the Supreme Court recognized an implied private action, directly under the Constitution, for damages against federal officials alleged to have violated a citizen's Fourth Amendment rights. *Bivens*, 403 U.S. 388. The case began when Webster Bivens sued Bureau of Narcotics Agents in federal court, alleging facts the Court "fairly read" as claiming Bivens' "arrest was made without probable cause." *Id.* at 389. Because the alleged constitutional violation had already occurred, Justice Harlan noted that, "[f]or people in Bivens' shoes, it [was] damages or nothing." *Id.* at 410 (Harlan, J., concurring in judgment).

The Court recognized a federal damages remedy apart from the availability of state common law remedies. *See id.* at 394–95. Noting Congress had not specifically provided a remedy for violations of constitutional rights and that "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation," *id.* at 396–97, the Court nevertheless relied on the rule that "where legal rights have been invaded . . . federal courts may use any available remedy to make good the wrong done." *Id.* at 396. Importantly, although no federal statute provided *Bivens* a right to sue for the invasion of his Fourth Amendment rights, the Court recognized a cause of action because it found "no special factors [counselled] hesitation in the absence of affirmative action by Congress." *Id.*

Since *Bivens*, the Supreme Court has proceeded cautiously in implying additional federal causes of action for money damages. In the decade immediately following the ruling, the Court extended *Bivens*' reach to claims involving employment discrimination in violation of the Due Process Clause, *Davis v. Passman*, 442 U.S. 228, 243–45 (1979), and cruel and unusual punishment by prison officials in violation

of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 19–23 (1980). But over time, the Court gradually retreated from *Bivens*, rejecting any "automatic entitlement" to the remedy, and noting that "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee . . . ." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

The best way to implement a particular constitutional guarantee, the Court decided, was to let Congress determine whether it warranted a cause of action. *See id*. at 562. Finding either that Congress had provided an alternative remedy or that special factors counseled hesitation, the Court declined to recognize a *Bivens* action for: 1) a federal employee's claim that his federal employer demoted him in violation of the First Amendment, *Bush v. Lucas*, 462 U.S. 367, 368–69 (1983); 2) a claim by military personnel that military superiors violated various constitutional provisions, *Chappell v. Wallace*, 462 U.S. 296, 298–300 (1983); 3) a claim by Social Security disability benefits recipients that benefits had been denied in violation of the Fifth Amendment, *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988); 4) a former bank employee's suit against a federal agency, claiming he lost his job due to agency action violating due process, *FDIC v. Meyer*, 510 U.S. 471, 484–86 (1994); 5) a prisoner's Eighth Amendment-based suit against a private corporation managing a federal prison, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73–74 (2001); 6) landowners' claims that government officials unconstitutionally interfered with their property rights, *Wilkie*, 551 U.S. 554–61; and 7) a prisoner's Eighth Amendment claim against private prison employees, *Minneci v. Pollard*, 132 S. Ct. 617, 623–26 (2012).

We, too, have tread carefully before recognizing *Bivens* causes of action when plaintiffs have invoked them in new

contexts, especially in cases within the national security arena. In *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), we declined to recognize a *Bivens* action for a Central Intelligence Agency operative and her husband to recover damages for injuries they allegedly suffered when her covert status was disclosed. We held that the Privacy Act's comprehensive remedial scheme was a "special factor" counseling hesitation before creating a *Bivens* remedy. *Id.* at 706–07. We also noted that, "if we were to create a *Bivens* remedy, the litigation . . . would inevitably require judicial intrusion into matters of national security and sensitive intelligence information." *Id.* at 710. In *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011), we were asked to recognize a *Bivens* action by noncitizen plaintiffs suing the former Secretary of Defense and three high-ranking Army officers for formulating and implementing policies that allegedly caused the torture and degrading treatment of plaintiffs. We disavowed the availability of *Bivens* because special factors, such as the "danger of obstructing U.S. national security policy," counseled hesitation. *Id.* at 773 (quoting *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009)). In *Doe*, we refused to create a *Bivens* action for a contractor, a U.S. citizen, who claimed the U.S. military wrongfully detained him in Iraq. We noted that recognizing a *Bivens* cause of action "is not something to be undertaken lightly," and we again found national security was a special factor counseling serious hesitation. 683 F.3d at 394.

Other circuits have also refrained from recognizing *Bivens* causes of action in the national security context. The Second Circuit, sitting en banc, concluded a dual citizen of Canada and Syria could not bring a *Bivens* action for a claim that the United States transferred him to Syria in order to subject him to torture and interrogation. *See Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009). The Fourth Circuit refused to

recognize a *Bivens* action for plaintiff Jose Padilla, who sued former high-level policy-makers in the Department of Defense based on his status as an enemy combatant. *See Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012). And the Seventh Circuit, sitting en banc, rejected the availability of *Bivens* for American citizen plaintiffs claiming they had been subjected to interrogation and mistreatment while in military detention. *See Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012). In each of these decisions, courts recognized that cases involving national security and the military counseled hesitation in recognizing a *Bivens* cause of action where Congress has not done so. *See id*. at 199–200; *Lebron*, 670 F.3d at 548–49; *Arar*, 585 F.3d at 575–76.

## B

Meshal asks us to paddle upstream against this deep current of authority. He contends his suit involves only core *Bivens* claims—Fourth and Fifth Amendment claims made against particular law enforcement officers for actions taken during a criminal investigation—so there is nothing new here. Conversely, the government contends this case implicates a new *Bivens* context for two reasons: (i) Meshal's claims involve alleged conduct undertaken as part of the FBI's counterterrorism responsibilities involving a national security investigation of terrorist activity: and (ii) the alleged acts of the federal officers occurred abroad.

We begin with some caveats. As we understand it, the Supreme Court has taken a case-by-case approach in determining whether to recognize a *Bivens* cause of action. *See Wilkie*, 551 U.S. at 550, 554; Anya Bernstein, *Congressional Will and the Role of the Executive in* Bivens *Actions: What Is Special About Special Factors?*, 45 IND. L. REV. 719, 720 (2012). We therefore need not decide,

categorically, whether a *Bivens* action can lie against federal law enforcement officials conducting non-terrorism criminal investigations against American citizens abroad. Nor do we decide whether a *Bivens* action is available for plaintiffs claiming wrongdoing committed by federal law enforcement officers during a terrorism investigation occurring within the United States. Our holding is context specific.[4]

Because of the procedural posture, we must reject the government's characterization that this case involved only a national security investigation, as distinct from an investigation that was both a national security and criminal investigation. In reviewing the grant of a motion to dismiss, we assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in the plaintiff's favor. *See Doe*, 683 F.3d at 391. The complaint alleges that Defendants Hersem and Higgenbotham were members of the FBI "jump team" or "fly team," the terms for those agents sent to Africa in 2007 "to conduct law enforcement investigations." J.A. 33. On the first day of Meshal's interrogation in Kenya and Ethiopia, Doe 1 presented Meshal with a document and asked him to sign it, "telling [Meshal] the document notified him that he could refuse to answer any questions without a lawyer present." J.A. 37, 60. The presence of *Miranda*-like waiver forms usually

---

[4] Nor do we question whether constitutional protections generally apply to American citizens outside the United States when dealing with their government. *See Reid v. Covert*, 354 U.S. 1, 6–10 (1957) (applying Fifth and Sixth Amendment rights to U.S. citizens facing military trial for murder overseas); *Al Bahlul v. United States*, 767 F.3d 1, 65 n.3 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part) ("As a general matter, the U.S. Constitution applies to U.S. citizens worldwide[.]").

signifies a criminal prosecution.[5] Meshal's experience was not unique. Kenyan authorities also arrested Daniel Maldonado, and FBI agents interrogated him in Kenya around the same time they held and interrogated Meshal. After Maldonado confessed, he pled guilty in federal district court to involvement in terrorist activities. J.A. 35–36; *see* Partial Tr. Prelim./Detention Hr'g, *United States v. Maldonado*, No. 4:07-mj-00125-1, 34–35 (S.D. Tex. 2007) (Dkt. No. 17). Drawing the inferences from the complaint in Meshal's favor, the agents' actions suggest a criminal investigation for terrorism, not purely intelligence-gathering. Even so, a criminal investigation into potential terrorism implicates some of the same special factor concerns as national security policy.

C

This case requires us to examine whether allowing a *Bivens* action to proceed would extend the remedy to a new context. *See Iqbal*, 556 U.S. at 675; *Malesko*, 534 U.S. at 68; *Wilkie*, 551 U.S. at 575 (Ginsburg, J., concurring in part and dissenting in part); *see also Arar*, 585 F.3d at 572 ("'Context' is not defined in the case law."). The Supreme Court has never defined what constitutes a new "context" for *Bivens* purposes, but in reviewing the case law, some patterns emerge. First, the Court considers a *Bivens* claim "new" when a plaintiff invokes a constitutional amendment outside the

---

[5] *See* FeiFei Jiang, *Dancing the Two-Step Abroad: Finding A Place for Clean Team Evidence in Article III Courts*, 47 COLUM. J.L. & SOC. PROBS. 453, 453 (2014) ("Federal agents often employ a two-step interview process for suspects in extraterritorial terrorism investigations. Agents conduct the first interview without *Miranda* warnings for the purpose of intelligence-gathering. Separate 'clean team' agents then give the suspect *Miranda* warnings prior to the second stage of the interview, which they conduct for law enforcement purposes.").

three amendments previously approved. *Compare Bivens*, 403 U.S. 388 (recognizing remedy for Fourth Amendment claims), *with Bush*, 462 U.S. 367 (refusing to recognize a *Bivens* remedy for a First Amendment violation). But even if the plaintiff alleges the same type of constitutional violation, it does not automatically invoke the same context for *Bivens* purposes. *Compare Passman*, 442 U.S. 228 (recognizing a *Bivens* remedy where plaintiff alleges employment discrimination under the Fifth Amendment's Due Process Clause), *with Schweiker*, 487 U.S. 412 (rejecting the availability of a *Bivens* remedy for social security claimants alleging a violation of due process under the Fifth Amendment). In addition, the Court considers a *Bivens* claim "new" when it involves a new category of defendants. *See Minneci*, 132 S. Ct. 617 (private prison employee); *Malesko*, 534 U.S. 61 (private prison corporation); *Meyer*, 510 U.S. 471 (federal agency); *Chappell*, 462 U.S. 296 (military defendants).

Meshal is correct that the claims here do not involve a different constitutional amendment or a new category of defendants. *See Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013) (noting the case involved an FBI agent "accused of violating the constitutional rights of a person targeted for a criminal investigation and prosecution," and noting those facts "parallel[ ] *Bivens* itself"). And Meshal correctly notes that *Bivens* remedies typically are available when based on actions taken by law enforcement officers during criminal proceedings. *See Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987) (acknowledging "the classic *Bivens*-style tort, in which a federal law enforcement officer uses excessive force, contrary to the Constitution or agency guidelines"). Yet viewed "[a]t a sufficiently high level of generality, any claim can be analogized to some other claim for which a *Bivens* action is afforded, just as at a sufficiently high level of

particularity, every case has points of distinction." *Arar*, 585 F.3d at 572. Like the Second Circuit in *Arar*, we construe "context" as it is commonly used in law: "to reflect a potentially recurring scenario that has similar legal and factual components." *Id.*

The context of this case is a potential damages remedy for alleged actions occurring in a terrorism investigation conducted overseas by federal law enforcement officers. Not only does Meshal's claim involve new circumstances—a criminal terrorism investigation conducted abroad—it also involves different legal components—the extraterritorial application of constitutional protections. Such a different context requires us to think anew. To our knowledge, no court has previously extended *Bivens* to cases involving either the extraterritorial application of constitutional protections[6] or in

---

[6] We considered a *Bivens* claim involving actions occurring overseas in *In re Sealed Case*, 494 F.3d 139 (D.C. Cir. 2007). There, a Drug Enforcement Agency officer stationed in Burma alleged a State Department official violated his Fourth Amendment rights when the official sent a classified cable transcribing a telephone call plaintiff had made to a subordinate. *Id.* at 141. In response, the government invoked the state secrets doctrine, which, when the district court applied the doctrine, essentially barred plaintiff's *Bivens* claim. On appeal, we noted the government had not challenged the application of the Fourth Amendment to actions occurring overseas, and we assumed, without analysis, *Bivens* applied. *Id.* at 143 ("The district court ruled that it was settled, indisputable law that the Fourth Amendment protects American citizens abroad, . . . and the United States does not challenge that ruling on appeal."). Consequently, *In re Sealed Case* did not establish that *Bivens* is available for all claims involving incidents occurring abroad.

the national security domain,[7] let alone a case implicating both—another signal that this context is a novel one.

Meshal downplays the extraterritorial aspect of this case. But the extraterritorial aspect of the case is critical. After all, the presumption against extraterritoriality is a settled principle that the Supreme Court applies even in considering statutory remedies. *See, e.g., Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013); *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010). If Congress had enacted a general tort cause of action applicable to Fourth Amendment violations committed by federal officers (a statutory *Bivens*, so to speak), that cause of action would not apply to torts committed by federal officers abroad absent sufficient indication that Congress meant the statute to apply extraterritorially. *See Morrison*, 130 S. Ct. at 2877. Whether the reason for reticence is concern for our sovereignty or respect for other states, extraterritoriality dictates constraint in the absence of clear congressional action.

---

[7] Neither *Mitchell v. Forsyth*, 472 U.S. 511 (1985), nor *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), help Meshal's cause. Although both cases involved *Bivens* claims in the national security context, in neither case did the Court explicitly consider whether to imply a *Bivens* cause of action. The Court instead, as has become its practice in some *Bivens* cases, seemed to assume without deciding that the claims were actionable under *Bivens*. *See, e.g., Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (assuming without deciding *Bivens* applied to a First Amendment viewpoint discrimination claim); *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) (same for First Amendment retaliatory arrest claim); *Iqbal*, 556 U.S. at 675 (same for First Amendment free exercise claim). Moreover, neither case involved extraterritoriality.

D

Once we identify a new context, the decision whether to recognize a *Bivens* remedy requires us to first consider whether an alternative remedial scheme is available and next determine whether special factors counsel hesitation in creating a *Bivens* remedy. *See Wilkie*, 551 U.S. at 550.

Meshal has no alternative remedy; the government does not claim otherwise. *See Meshal*, 47 F. Supp. 3d at 122 ("The parties agree that Mr. Meshal has no alternative remedy for his constitutional claims."). Meshal, backed by a number of law professors appearing as amici curiae, argues that, when the choice is between damages or nothing, a *Bivens* cause of action must lie. The Supreme Court, however, has repeatedly held that "even in the absence of an alternative" remedy, courts should not afford *Bivens* remedies if "any special factors counsel[ ] hesitation." *Wilkie*, 551 U.S. at 550; *see also Schweiker*, 487 U.S. at 421–22. *Cf. Wilson*, 535 F.3d at 708–09. Put differently, even if the choice is between *Bivens* or nothing, if special factors counsel hesitation, the answer may be nothing. *See* Andrew Kent, *Are Damages Different?:* Bivens *and National Security*, 87 S. CAL. L. REV. 1123, 1151 (2014) ("Kent") (noting "the Court's *Bivens* doctrine has long tolerated denying *Bivens* even when there is no other effective remedy").

The "special factors" counseling hesitation in recognizing a common law damages action "relate not to the merits of the particular remedy, but to the question of who should decide whether such a remedy should be provided." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (Scalia, J.). Where an issue "involves a host of considerations that must be weighed and appraised," its resolution

"is more appropriately for those who write the laws, rather than for those who interpret them." *Bush*, 462 U.S. at 380.

Two special factors are present in this case. We do not here decide whether either factor alone would preclude a *Bivens* remedy, but both factors together do so. First, special factors counseling hesitation have foreclosed *Bivens* remedies in cases "involving the military, national security, or intelligence." *Doe*, 683 F.3d at 394. Second, the Supreme Court has never "created or even favorably mentioned a non-statutory right of action for damages on account of conduct that occurred outside the borders of the United States." *Vance*, 701 F.3d at 198–99.

Adding to the general reticence of courts in cases involving national security and foreign policy, the government offers a laundry list of sensitive issues they say would be implicated by a *Bivens* remedy. Further litigation, the government claims, would involve judicial inquiry into "national security threats in the Horn of Africa region," the "substance and sources of intelligence," and whether procedures relating to counterterrorism investigations abroad "were correctly applied." Br. for the Appellees at 25–26, Meshal v. Higgenbotham, No. 14-5194 (D.C. Cir. Feb. 13, 2015). The government also alleges *Bivens* litigation would require discovery "from both foreign counterterrorism officials, and U.S. intelligence officials up and down the chain of command, as well as evidence concerning the conditions at alleged detention locations in Ethiopia, Somalia, and Kenya." *Id*. at 26.

Unlike other cases where a plaintiff challenges U.S. policy, the plaintiff here challenges only the individual actions of federal law enforcement officers. At oral argument, the government had few concrete answers concerning what

sensitive information might be revealed if the litigation continued. Oral Arg. Recording 28:00–28:22; 29:52–29:59; 36:47–37:10. Why would an inquiry into whether the Defendants threatened Meshal with torture or death require discovery from U.S. intelligence officials up and down the chain of command? Why would an inquiry into Meshal's allegedly unlawful detention without a judicial hearing reveal the substance or source of intelligence gathered in the Horn of Africa? What would make it necessary for the government to identify other national security threats? Neither party knows exactly what discovery will entail because no similar *Bivens* claim has survived the motion to dismiss stage. Still, to some extent, the unknown itself is reason for caution in areas involving national security and foreign policy—where courts have traditionally been loath to create a *Bivens* remedy.

At the end of the day, we find the absence of any *Bivens* remedy in similar circumstances highly probative. Matters touching on national security and foreign policy fall within an area of executive action where courts hesitate to intrude absent congressional authorization. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). Thus, if there is to be a judicial inquiry—in the absence of congressional authorization—in a case involving both the national security and foreign policy arenas, "it will raise concerns for the separation of powers in trenching on matters committed to the other branches." *Christopher v. Harbury*, 536 U.S. 403, 417 (2002). The weight of authority against expanding *Bivens*,[8]

---

[8] Even one of Meshal's amici suggests that our prior decisions saying no to *Bivens* in cases involving national security prevents the panel from creating a *Bivens* action here. *See* Steve Vladeck, Meshal: *The Last, Best Hope for National Security* Bivens *Claims?*, JUST SECURITY (June. 17, 2014, 4:09 PM), http://justsecurity.org-/11784/meshal ("Of course, that these three circuit-level decisions (especially the D.C. Circuit's decision in *Doe*) compel the result in

combined with our recognition that tort remedies in cases involving matters of national security and foreign policy are generally left to the political branches, counsels serious hesitation before recognizing a common law remedy in these circumstances.

There are also practical factors counseling hesitation. One of the questions raised by Meshal's suit is the extent to which Defendants orchestrated his detention in foreign countries. The Judiciary is generally not suited to "second-guess" executive officials operating in "foreign justice systems." *Munaf v. Geren*, 553 U.S. 674, 702 (2008). And judicial intrusion into those decisions could have diplomatic consequences. *See* Br. for the Appellees at 26 (allowing *Bivens* here would expose "the substance of diplomatic and confidential communications between the United States and foreign governments" regarding joint terrorism investigations). Moreover, allowing *Bivens* suits involving both national security and foreign policy areas will "subject the government to litigation and potential law declaration it will be unable to moot by conceding individual relief, and force courts to make difficult determinations about whether and how constitutional rights should apply abroad and outside the ordinary peacetime contexts for which they were developed." Kent, at 1173. Even if the expansion of *Bivens* would not impose "the sovereign will of the United States onto conduct by foreign officials in a foreign land," Dissent at 18, the actual repercussions are impossible to parse. We cannot forecast how the spectre of litigation and the potential discovery of sensitive information might affect the enthusiasm of foreign states to cooperate in joint actions or the government's ability to keep foreign policy commitments

the district court in *Meshal* says nothing about whether the en banc D.C. Circuit or Supreme Court would necessarily agree.").

or protect intelligence. Just as the special needs of the military requires courts to leave the creation of damage remedies against military officers to Congress, so the special needs of foreign affairs combined with national security "must stay our hand in the creation of damage remedies." *Sanchez-Espinoza*, 770 F.2d at 208–09.

## III

### A

Meshal claims his U.S. citizenship outweighs the national security and foreign policy sensitivities implicated by permitting a *Bivens* claim. We are not unsympathetic. American citizenship has inherent value. *See Tuaua v. United States*, No. 13-5272, slip op. at 14 (D.C. Cir. June 5, 2015) (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963)). Even so, the "source of hesitation" in the *Bivens* special factor analysis "is the nature of the suit and the consequences flowing from it, not just the identity of the plaintiff." *Lebron*, 670 F.3d at 554; *see also Vance*, 701 F.3d at 203. At no point has the Supreme Court intimated that citizenship trumps other special factors counseling hesitation in creating a *Bivens* remedy.

### B

Meshal, and several law professors as amici, claim two congressional actions amounted to statutory ratification of *Bivens*. They further claim courts have consistently misinterpreted these legislative actions, and, consequently, have taken an unduly narrow view of *Bivens*.

In 1973, Congress rejected a Department of Justice proposal to substitute the federal government as the defendant

in all intentional tort suits against federal officers, including those raising constitutional claims, as part of the Federal Tort Claims Act. *See* James E. Pfander & David Baltmanis, *Rethinking* Bivens: *Legitimacy and Constitutional Adjudication*, 98 GEO. L. J. 117, 131 & n.79 (2009) ("Pfander & Baltmanis"); *see also* S. REP. NO. 93–588, at 3 (1973). In 1988 Congress again rejected a DOJ proposal to funnel all liability into claims brought against the government rather than individual federal officers. *See* Pfander & Baltmanis, at 135 n.100; Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act*, *and the Nature of the* Bivens *Question*, 161 U. PA. L. REV. 509, 566–70 (2013) ("Vázquez & Vladeck"). Congress instead passed the Westfall Act, providing that the FTCA would be the exclusive remedy for federal officials sued for "scope-of-employment" torts. Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 5, 102 Stat. 4563, 4564 (codified at 28 U.S.C. § 2679(b)). In addition to creating detailed procedures for converting state torts claims against individual officers into FTCA claims against the United States, the Westfall Act provided an exception to the exclusive-remedy provision, stating it would not "extend or apply to a civil action . . . which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Thus, Congress expressly granted an exemption from the FTCA for *Bivens* suits. *See Hui v. Castaneda*, 559 U.S. 799, 807 (2010) ("Notably, Congress also provided an exception for constitutional violations."); H.R. Rep. 100-700, at 6, 1988 U.S.C.C.A.N. 5945, 5950 ("Since the Supreme Court's decision in [*Bivens*], the courts have identified [a constitutional] tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, [the Westfall Act] would not affect the ability of victims of constitutional torts to seek personal

redress from Federal employees who allegedly violate their Constitutional rights.").

But whether Congress, in rejecting Justice Department proposals and providing a FTCA exemption, meant to ratify *Bivens* is open to doubt. Congress may have viewed *Bivens* and federal tort claims as "parallel, complementary causes of action," *Carlson*, 446 U.S. at 20, and intended, through the Westfall Act, to "solidify the *Bivens* remedy," Pfander & Baltmanis, at 121–22. Or Congress could have thought "*Bivens* was a constitutionally required decision," *Carlson*, 446 at 33 n.2 (Rehnquist, J., dissenting), thus believing it could not legislate away *Bivens* remedies. We normally presume Congress legislates consistently with constitutional commands, *see United States v. X–Citement Video, Inc.*, 513 U.S. 64, 73 (1994), so mere congressional acquiescence to *Bivens* may not be the same as congressional ratification. And even if Congress did somehow ratify *Bivens*,[9] we would be left with yet another question: Did Congress intend to ratify *Bivens*' scope as it was in 1988 or more broadly? *See* Vázquez & Vladeck, at 579. If Congress intended to ratify *Bivens* only as it existed in 1988 then this would be an easy case.

There are no definitive answers to these competing visions of congressional action. We are not foreclosing either interpretation, but in a case where the thumb is heavy on the scale against recognizing a *Bivens* remedy, uncertain

---

[9] If Congress really desired a ratification of *Bivens*, its actions were not a model of clarity. Congress did not place *Bivens* causes of action in a separate statutory provision as it did for federal questions and constitutional violations committed by state actors. *See* 28 U.S.C. § 1331; 42 U.S.C. § 1983. Instead, it merely created an exception to FTCA immunity for constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A).

interpretations of what Congress did in 1973 and 1988 cannot overcome the weight of authority against expanding *Bivens*. In any event, if the courts, as amici argue, have radically misunderstood the nature and scope of *Bivens* remedies, a course correction must come from the Supreme Court, which has repeatedly rejected calls for a broad application of *Bivens*. *See supra*, at Part IIC. Because we follow its lead, we will ship our oars until that Court decides the scope of the remedy *it* created.

If people like Meshal are to have recourse to damages for alleged constitutional violations committed during a terrorism investigation occurring abroad, either Congress or the Supreme Court must specify the scope of the remedy.

## IV

Because Meshal has not stated a valid cause of action, the judgment of dismissal is

*Affirmed.*

KAVANAUGH, *Circuit Judge*, concurring:  The United States is at war against al Qaeda and other radical Islamic terrorist organizations.  Shortly after al Qaeda's attacks on the United States on September 11, 2001, Congress authorized this war.  President Bush and President Obama have aggressively commanded the U.S. war effort.

The terrorists' stated goals are, among other things, to destroy the State of Israel, to drive the United States from its posts in the Middle East, to replace more moderate Islamic leadership in nations such as Saudi Arabia, and to usher in radical Islamic control throughout the Greater Middle East. In pursuing their objectives, the terrorists have repeatedly attacked U.S. persons and property, both in foreign countries and in the U.S homeland.

The war continues.  No end is in sight.

In waging this war, the United States has wielded a wide array of federal assets, including the military, the CIA, the FBI, and other U.S. intelligence and law enforcement agencies.  The traditional walls dividing military, intelligence, and law enforcement operations have given way to a more integrated war effort.  As President Bush and President Obama have explained, the United States employs military, intelligence, and law enforcement personnel in an often unified effort to detect, surveil, capture, kill, detain, interrogate, and prosecute the enemy.

In this case, U.S. law enforcement officers detained and interrogated Meshal in a foreign country.  They suspected that Meshal might be an al Qaeda terrorist.  Meshal alleges that he was mistakenly detained and then abused.  He has brought a tort suit against the individual officers under *Bivens*, and he seeks damages presumably in the hundreds of thousands of dollars from those officers in their individual capacities.

The *Bivens* doctrine allows parties to maintain certain constitutional tort suits against federal officers in their individual capacities, even in the absence of an express congressionally created cause of action. The classic *Bivens* case entails a suit alleging an unreasonable search or seizure by a federal officer in violation of the Fourth Amendment. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Since *Bivens*, however, the Supreme Court has been reluctant to extend the implied *Bivens* cause of action to new contexts. The Court has emphasized that it is ordinarily Congress's role, not the Judiciary's, to create and define the scope of federal tort remedies. As the Court has explained, *Bivens* carved out only a narrow exception to that bedrock separation of powers principle.

Here, Meshal proceeded under *Bivens* because Congress has not created a cause of action for his alleged injury. As the Court today spells out, Congress has enacted a number of related tort causes of action. For example, the Federal Tort Claims Act provides a cause of action for torts committed by federal officials. But that law exempts torts committed in a foreign country. So it does not help Meshal. The Torture Victim Protection Act provides a cause of action for torture committed by foreign officials. But the statute exempts U.S. officials, a point that President George H.W. Bush stressed when signing the legislation in 1992. *See* 28 U.S.C. §§ 2671 *et seq.*; *id.* § 1350 Note; *see also* Statement on Signing the Torture Victim Protection Act of 1991, 1 Pub. Papers 437-38 (Mar. 12, 1992). So that law likewise does not help Meshal. The bottom line is that neither of those statutes, nor any other, creates a cause of action against U.S. officials for torts committed abroad in these circumstances. *See* 28 U.S.C. § 2680(k); *id.* § 1350 Note, § 2(a).

Lacking any statutory cause of action, Meshal has sued under *Bivens*. The Department of Justice, speaking ultimately as the representative of President Obama, has vigorously argued that the implied *Bivens* cause of action cannot be stretched to cover Meshal's case. According to the Department of Justice, *Bivens* does not apply here because the alleged conduct occurred during a national security investigation in a foreign country, a setting different in multiple important respects from the heartland *Bivens* case. Faithfully following existing Supreme Court precedent, Judge Emmet Sullivan agreed with the Department of Justice and dismissed Meshal's suit. The Court today affirms, and I fully join its thorough and well-reasoned opinion.

I add this concurrence to underscore a few points in response to the dissent.

The fundamental divide between the majority opinion and the dissent arises over a seemingly simple question: Who Decides? In particular, who decides whether to recognize a cause of action against U.S. officials for torts they allegedly committed abroad in connection with the war against al Qaeda and other radical Islamic terrorist organizations? In my view, the answer is Congress, not the Judiciary.

In confining the coverage of statutes such as the Federal Tort Claims Act and the Torture Victim Protection Act, Congress has deliberately decided not to fashion a cause of action for tort cases like Meshal's. Given the absence of an express cause of action, the dissent seizes upon *Bivens*. How does the dissent deal with the Supreme Court's oft-repeated caution against extending *Bivens* to new contexts? The dissent argues that this case does not present a new context.

On that point, I respectfully but strongly disagree with the dissent. Most importantly, the alleged conduct in this case

occurred *abroad*. So far as the parties have been able to uncover, never before has a federal court recognized a *Bivens* action for conduct by U.S. officials abroad. *Never.* In statutory cases, we employ a presumption against extraterritoriality. There is no persuasive reason to adopt a laxer extraterritoriality rule in *Bivens* cases. It would be grossly anomalous, in my view, to apply *Bivens* extraterritorially when we would not apply an identical statutory cause of action for constitutional torts extraterritorially. *Cf. Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013); *Morrison v. National Australia Bank Limited*, 561 U.S. 247, 255 (2010).

This case is far from the *Bivens* heartland for another reason as well. It involves a *national security* investigation during a congressionally authorized war, not a simple arrest for securities fraud, drug trafficking, or the like. Other courts of appeals have refused to recognize *Bivens* actions for alleged conduct that occurred during national security investigations, even for conduct that occurred in U.S. territory. *See Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012); *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009); *see also Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012). We should do the same in this case, especially because the conduct here occurred in a foreign country. The dissent responds that the Government has not demonstrated that this case is national-security-related. But U.S. officials were attempting to seize and interrogate suspected al Qaeda terrorists in a foreign country during wartime. If this case is not national-security-related, it is hard to see what is. The dissent counters that the U.S. had not designated Meshal as an enemy combatant. But that misses the key point: The U.S. was conducting an investigation to determine *whether* Meshal was an enemy combatant. In this war, the U.S. seeks to proactively confront terrorist threats before they fully materialize. Close calls may

arise in labeling an investigation as national-security-related. Not here.

The confluence of those two factors – extraterritoriality and national security – renders this an especially inappropriate case for a court to supplant Congress and the President by erecting new limits on the U.S. war effort. Make no mistake. If we were to recognize a *Bivens* action in this case, U.S. officials undoubtedly would be more hesitant in investigating and interrogating suspected al Qaeda members abroad. Of course, some might argue that would be a good thing. Maybe so, maybe not. Either way, it is not our decision to make. Congress and the President possess the authority to restrict the actions of U.S. officials during wartime, including by approving new tort causes of action. And in this war, they have done so by enacting new statutes such as the Detainee Treatment Act and the Military Commissions Act. But they have not created a tort cause of action for this kind of case. In my view, we would disrespect Congress and the President, and disregard our proper role as judges, if we were to recognize a *Bivens* cause of action here.

\* \* \*

In justiciable cases, courts should not hesitate to enforce constitutional and statutory constraints on wartime activities. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) (Kavanaugh, J.). But courts should not – under the guise of *Bivens* – *unilaterally* recognize new limits that restrict U.S. officers' wartime activities. As Justice Jackson stated in his canonical concurrence in *Youngstown*, courts "should indulge the widest latitude of interpretation to sustain" the President's command of "the instruments of national force, at least when turned against the outside world

for the security of our society." 343 U.S. at 645 (Jackson, J., concurring). If I were a Member of Congress, I might vote to enact a new tort cause of action to cover a case like Meshal's. But as judges, we do not get to make that decision. For those reasons, I respectfully disagree with the dissent and fully join the Court's opinion.

PILLARD, *Circuit Judge*, dissenting:

As the majority observes, the allegations in this case are deeply troubling. *See* Maj. Op. at 2. For purposes of this decision, we must assume the truth of the facts Meshal alleges. The defendant FBI officers arbitrarily detained Meshal in secret in three different countries for four months without charges, denied him access to counsel and the courts, coercively interrogated him, and threatened him with disappearance and death. *Id.* at 3-5. They did so to "coerce him to confess to wrongdoing in which he had not engaged and to associations he did not have." J.A. 16 (Complaint ¶ 3). Neither the United States nor any other government ever charged Meshal with a crime. Maj. Op. at 4-5. Our concurring colleague asserts that "U.S. officials were indisputably attempting to seize and interrogate suspected al Qaeda terrorists in a foreign country during wartime," Conc. Op. at 4, but there is zero basis here on which we could conclude that these defendants had grounds for treating this plaintiff as a suspected al Qaeda terrorist, or that they acted pursuant to the President's war powers. To the contrary, the government never designated Meshal an enemy combatant, and it eventually released him and returned him to the United States. Maj. Op. at 5. Neither defendants nor this panel doubts that Meshal properly stated Fourth and Fifth Amendment claims. *See* J.A. 14; Maj. Op. at 5-6. The only issue is whether, if the allegations were true, they would have consequences.

Had Meshal suffered these injuries in the United States, there is no dispute that he could have sought redress under *Bivens*. If Meshal's tormentors had been foreign officials, he could have sought a remedy under the Torture Victim Protection Act. Yet the majority holds that because of unspecified national security and foreign policy concerns, a United States citizen who was arbitrarily detained, tortured, and threatened with disappearance by United States law

enforcement agents in Africa must be denied any remedy whatsoever.

I would reverse the judgment dismissing Meshal's case and remand for further proceedings for the following two reasons:

*First*, congressional action supports a constitutional damages claim where, as here, it would not intrude on the unique disciplinary structure of the military and where there is no comprehensive regulation or alternative remedy in place; and

*Second*, where FBI agents arbitrarily detain a United States citizen overseas and threaten him with disappearance and death during months of detention without charges, those agents' mere recitation of foreign policy and national security interests does not foreclose a constitutional damages remedy.

I am unpersuaded that adjudicating Meshal's constitutional damages claim would necessarily pose unacceptable risks to the national security and foreign policy of the United States. The government has submitted no certification or declaration of any authoritative diplomatic or national security officer to substantiate defendants' sweeping national security and diplomatic relations claims. Defendants instead rely on generalized assertions that any litigation of Meshal's *Bivens* claim would involve unacceptable risks. Such assertions do not, in my view, constitute the kind of "special factors" that justify eliminating the *Bivens* remedy in a case like this one.

Courts have no power to make national security policy or conduct foreign affairs and, in fulfilling our own constitutional duty, the Article III courts must not imperil the

foreign relations or national security of the United States. But no less today than when the Supreme Court decided *Bivens*, "the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 407 (1971) (Harlan, J., concurring in judgment). Government is most tempted to disregard individual rights during times of exigency. Judicial scrutiny becomes particularly important when executive officials assert that individual rights must yield to national security and foreign policy imperatives. Presented with cases involving assertions of paramount national interests in apparent tension with individual liberty, the federal courts have proved competent to adjudicate. Removing all consequence for violation of the Constitution treats it as a merely precatory document. *See Davis v. Passman*, 442 U.S. 228, 242 (1979). We should not do so without more justification than was presented here.

Our responsibility in cases pitting claims of individual constitutional liberties against national security is to discern how the judiciary can meet its responsibility without either second-guessing the sound judgments of the political branches, or rubber-stamping every invocation of the capacious and malleable concept of "national security" at the expense of the liberty of the people. The fundamental character of our separation of powers prevents us from simply ceding to executive prerogatives: "[I]t would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his Government, simply because the Executive opposes making available such a challenge." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536-37 (2004).

To meet that responsibility, courts have demanded that governmental assertions of national security interests be authoritative and specific. We have used special procedures and mechanisms to consider those interests and accord them appropriate respect without abdicating our constitutional duties to adjudicate claims of violation of individual constitutional rights. Measures such as courts' inspection of evidence under seal or even *in camera*, coding to anonymize valuable and sensitive information, security clearances of counsel and court personnel, and other special accommodations have helped to preserve courts' ability to adjudicate in the face of countervailing executive imperatives. Courts developed the state secrets privilege to safeguard against damaging litigation disclosures of national security information. That doctrine's requirements are designed to ensure that it not be lightly invoked, and to tailor its impact on countervailing rights. Defendants here contend that they need not submit to any such controls. Rather, they would have us categorically turn away claims that ostensibly touch on national security and foreign policy. No precedent of the Supreme Court, this court, or any other United States court requires that result.

The United States government itself elsewhere cites the availability of *Bivens* claims as fulfilling our treaty obligations to provide remedies for arbitrary detention and torture wherever it may occur, in peace or conflict. *See infra* pp. 14-15. Yet defendants would deny that promise, leaving Meshal with no remedy whatsoever—whether under state or federal law, constitutional, administrative, or otherwise. Their position is that an American citizen who ventures beyond our borders has no legal remedy against arbitrary and prolonged detention and mistreatment at the hands of FBI agents—so long as those agents were sent overseas to protect United States interests.

Because I cannot conclude that either the Supreme Court or our court has ever read the Constitution and laws of the United States to support that result, and I am not persuaded that defendants have provided us with grounds to do so here, I respectfully dissent.

## I.

Meshal's case is unlike those in which the Supreme Court or this court has declined to recognize a *Bivens* remedy. Here, as the majority acknowledges, Meshal is suing the typical *Bivens* defendant. Maj. Op. at 13. When FBI agents violate a suspect's Fourth and Fifth Amendment rights by detaining him without charges and threatening him with torture, disappearance, and death, a *Bivens* remedy is ordinarily available. *See id.*

Defendants are not among the types of nongovernmental or organizational actors beyond the reach of *Bivens*: they are not a private corporation, *cf. Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73-74 (2000), its employees, *cf. Minneci v. Pollard*, 132 S. Ct. 617, 623-26 (2012), or a federal governmental agency, *cf. FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994). *See* Maj. Op. at 8, 13.

These claims, if allowed to proceed under *Bivens*, would not sidestep any comprehensive scheme or alternative remedy addressing the conduct at issue. Maj. Op. at 8; *cf. Wilkie v. Robbins*, 551 U.S. 537, 553-62 (2007); *Schweiker v. Chilicky*, 487 U.S. 412, 414, 424-29 (1988); *Bush v. Lucas*, 462 U.S. 367, 388 (1983); *Wilson v. Libby*, 535 F.3d 697, 706-08 (D.C. Cir. 2008).

Meshal's claims also do not implicate the unique demands of military discipline. He is not a service member or

military contractor, his claims did not arise in the theater of war, nor are the defendant's asserted security interests those of the military, its chain of command, or alternate disciplinary structure. *Cf. United States v. Stanley*, 483 U.S. 669, 683-84 (1987)*; Chappell v. Wallace*, 462 U.S. 296, 303-06 (1983); *Doe v. Rumsfeld*, 683 F.3d 390, 394-96 (D.C. Cir. 2012); *Lebron v. Rumsfeld*, 679 F.3d 540, 549-51, 553 (4th Cir. 2012)*; Vance v. Rumsfeld*, 701 F.3d 193, 199-203 (7th Cir. 2012) (en banc)*.

The foreign affairs implications that arise when an alien sues United States officials are absent here. Meshal is an American citizen, born and raised in New Jersey, to whom the constitutional protections asserted here apply both at home and when he goes overseas as a civilian tourist. *Reid v. Covert*, 354 U.S. 1, 5-10 (1957) (plurality) (rejecting "the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights"); Maj. Op. at 11 n.4; Oral Arg. Tr. at 19 (defendants' counsel acknowledging constitutional rights of United States citizens abroad). Conflict within Somalia displaced Meshal and other civilians, but Meshal does not allege he was arrested or detained in any zone in which the United States was engaged in war or military hostilities. J.A. 13.

Precedent does not permit us categorically to rule out any civil remedy for these alleged wrongs. In my view, defendants' national security and foreign policy "special factors" are overstated and under-explained. I do not read the Supreme Court's cases to hold that "the thumb is heavy on the scale against recognizing a *Bivens* remedy" in a situation such as this one. Maj Op. at 22. To the contrary, the Supreme Court's holding in *Bivens* that damages are an appropriate remedy for a Fourth Amendment violation remains the law of the land. And no one disputes that a Fifth Amendment claim

for arbitrary detention and coercive interrogation under threats of disappearance and death would be cognizable under *Bivens* if it occurred in the United States. *See Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) (Posner, J.) (recognizing *Bivens* Fifth Amendment due process claim in "a case in which a person who had been arrested but not charged or convicted was brutalized while in custody"), *cert. denied*, 493 U.S. 1026 (1990); *see also Hernandez v. United States*, 757 F.3d 249, 271, 277 (5th Cir. 2014) (recognizing *Bivens* Fifth Amendment claim extraterritorially for "conscience-shocking conduct").

Defendants assert that any judicial consideration of Meshal's claims would interfere with foreign policy and national security, but they have failed to make the case. In the district court, defendants' counsel said "I don't know how the foreign government is alleged to have been involved in this particular operation." J.A. 14. At oral argument in our court, as the majority notes, counsel for defendants "had few concrete answers concerning what sensitive information might be revealed if the litigation continued." Maj. Op. at 17.

The only authority defendants cite for any threat to national security is the district court's recapitulation of defendants' own contentions in their lower-court briefs that litigation of Meshal's claims "implicate national security threats in the Horn of Africa region" and "substance and sources of intelligence." *See* Appellee Br. 11, 13, 24-27, 36-37; Br. in Supp. of Mot. to Dismiss at 13-14. They assert that adjudication would require the public release of sensitive national security information, but they provide no basis for us to evaluate that assertion. Defendants also have done nothing to explain why the more targeted tools available to courts to protect such information, such as confidential or *in camera*

processes or the state secrets privilege, would be inadequate here.

## II.

I explain my conclusion by following the "familiar sequence" the Supreme Court employs to consider whether any "alternative, existing processes," or "special factors" justify denying Meshal's *Bivens* claim. *Wilkie*, 551 U.S. at 550.

## A.

Precedent directs us to consider first "whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain" from superimposing a *Bivens* remedy on that process. *Minneci*, 132 S. Ct. at 621 (quoting *Wilkie*, 551 U.S. at 550) (brackets in original). Nobody contends that there is any "alternative, existing process" for protecting Meshal's constitutional rights. *See* Maj. Op. at 15-16; Conc. Op. at 2-3. The parties and the court agree that, in these circumstances, it is *Bivens* or nothing. *See Davis* 442 U.S. at 246. Unlike plaintiffs in the cases in which the Supreme Court has held that *Bivens* is unavailable, Meshal has no alternative state tort remedy, *cf. Minneci*, 132 S. Ct. at 623, 626 (state tort remedy for alleged Eighth Amendment claims against private prison employees); *Wilkie*, 551 U.S. at 551 (state tort remedy for alleged unconstitutional interference with property rights); *Malesko*, 534 U.S. at 73-74 (state tort remedy for alleged Eighth Amendment claims against private prison corporation), and Congress has not provided any other remedy or comprehensive scheme to displace *Bivens* here, *cf., e.g.*, *Schweiker*, 487 U.S. at 424-27 (Social Security Act); *Bush*, 462 U.S. at 380-81, 388

(comprehensive federal civil service regulation); *Wilson*, 535 F.3d at 705-08 (Privacy Act); *Chappell*, 462 U.S. at 304 (recognizing "unique disciplinary structure of the military establishment" as "special factor").

The majority acknowledges that Congress at various times has acted in ways that appear to have ratified *Bivens*, but ultimately concludes that congressional acquiescence is "open to doubt," and so treats the congressional activity in the area as a draw. Maj. Op. at 20-22. The basis of the majority's doubt is unpersuasive: my colleagues wonder whether Congress has preserved *Bivens* for almost half a century only because it thought it had to. *Id*. at 21-22. But the Supreme Court from *Bivens* onward has emphasized that Congress may displace the constitutional common-law remedy. In the face of that invitation to legislate, Congress has consistently preserved a place for judicially recognized *Bivens* claims.

In particular, as the majority acknowledges, even as Congress periodically amended the Federal Tort Claims Act (FTCA), which provides an exclusive federal statutory remedy against the government for state common-law torts by United States officials, Congress purposely left intact the judicially fashioned *Bivens* remedy for constitutional torts by those same officials. Congress in the 1974 amendments to the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Carlson v. Green*, 446 U.S. 14, 19-20 (1980) (citing 28 U.S.C. § 2680(h)). And again, in 1988 when the Westfall Act amended the FTCA to immunize federal officials from personal liability for common law torts committed within the scope of their employment and substitute the United States as the sole defendant to those claims, Congress specified that such substitution-and-immunity does not apply to claims

"brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Congress designed the Westfall Act so as "not to affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights"—a type of violation that is "a more serious intrusion on the rights of an individual that merits special attention." H.R. Rep. No. 100-700, at 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949-50. Congress has preserved constitutional damages claims even where they are parallel to and thus sometimes overlap with FTCA claims that provide a limited federal statutory vehicle for enforcing the substantive protections of state tort law; there is no basis to read that longstanding acceptance of *Bivens* as signaling congressional intent to eliminate constitutional damages claims when no overlapping or substitute claim exists.

The majority recognizes all of that, Maj. Op. at 20-21, but wonders whether Congress may have preserved *Bivens* only out of concern that the remedy is constitutionally compelled, *id.* at 21-22. There is no basis for any such conclusion. The concurrence finds compelling that Congress has not codified any alternative remedy for Meshal's harms. Conc. Op. at 3. But congressional restraint cuts the other way. As noted above, when Congress was making the relevant amendments to the FTCA, the Supreme Court had already repeatedly reiterated its own understanding that the judicially recognized remedy could be displaced by a congressional substitute. *See, e.g.*, *Bush*, 462 U.S. at 378-79; *Carlson*, 446 U.S. at 18-20; *Davis*, 442 U.S. at 245-47; *Bivens*, 403 U.S. at 397. Despite addressing many other related types of claims, Congress has enacted no alternative that would displace a claim like Meshal's. Against that backdrop, Congress's acquiescence cannot be read as

misguided submission to, let alone rejection of, *Bivens* in these circumstances.

Defendants point out that the FTCA explicitly affords no tort remedy for injuries "arising in a foreign country." 28 U.S.C. § 2680(k). They contend the exception shows Congress's intention to deny a constitutional tort remedy to individuals injured abroad by United States agents. But the reason Congress excluded extraterritorial claims from the FTCA was not to deny all damages liability for tort-like harms inflicted by United States agents overseas. That exclusion is specific to the FTCA, under which liability is determined "in accordance with the [tort] law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), *i.e.* by the common law of the various states. Congress "was unwilling to subject the United States to liabilities depending upon the laws of a foreign power." *United States v. Spelar*, 338 U.S. 217, 221 (1949). The exemption shows only that the FTCA aimed to incorporate the tort law of Texas or Illinois but not of Kenya or Ethiopia. The concerns animating the FTCA's extraterritorial carve-out are inapplicable where the United States Constitution, not any foreign country's law, supplies the rule of decision.

The majority also asserts that "if Congress really desired a ratification of *Bivens*," it would have "place[d] *Bivens* causes of actions in a separate statutory provision," such as 28 U.S.C. § 1331 or 42 U.S.C. § 1983. Maj. Op. at 22 n.9. But Congress did not need to do that. Section 1331 provides general federal question jurisdiction. It is the very provision upon which Webster Bivens's claim proceeded. *Bivens*, 403 U.S. at 398 (Harlan, J., concurring in judgment). As Justice Harlan noted, Section 1331 "is sufficient to empower a federal court to grant a traditional remedy at law" for a Fourth

Amendment violation. *Id.* at 405.[1] Demanding a showing that Congress created an analogue to Section 1983 for claims against federal officials also goes too far; had Congress done so, there would be no need for *Bivens*. *See Lebron*, 670 F.3d at 548 (acknowledging that "[w]e do not require congressional action before recognizing a *Bivens* claim, as that would be contrary to *Bivens* itself"). And once the Court decided *Bivens*, there was no need for a Section 1983-like statutory vehicle. Defendants point to other statutes providing remedies to detainees abused at the hands of government officials to argue that Congress could have created a cause of action for plaintiffs in Meshal's position, but chose not to do so. They contend that congressional action "in this field" that creates no damages remedy for Meshal is a "special factor[] that counsel[s] hesitation." Appellee Br. 39. The majority correctly places no reliance on that argument. The additional congressional action defendants identify is wholly consistent with Congress's acquiescence to *Bivens* for claims like Meshal's.

The Military Claims Act and Foreign Claims Act provide an administrative compensation system for individuals harmed by military officials or contractors at home or abroad. *See* 10 U.S.C. § 2733 (Military Claims Act); *id.* § 2734 (Foreign Claims Act). Defendants do not contend that any such claims process is available to a civilian harmed by

---

[1] Damages are the traditional remedy at law, *Bivens*, 403 U.S. at 395, and are less intrusive and thus more readily reconciled with national security prerogatives than an injunction disrupting ongoing official activities. *Cf. Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 921-22 (D.C. Cir. 1996) (injunctive relief "was never regarded as relief of first resort" because, "in tort actions, the standard formulation of the common law . . . is that equitable relief, such as an injunction, will be granted only when plaintiff's legal remedies are inadequate").

nonmilitary United States agents overseas, so it is unclear how those statutes could imply any congressional disinclination toward Meshal's *Bivens* claim. Indeed, the fact that Congress provided a remedy to persons in special-factors military cases excluded from *Bivens*' reach suggests congressional solicitude for persons who would otherwise lack compensation. *See Vance*, 701 F.3d at 200-01 (enumerating statutes governing the treatment of military detainees to conclude that "[u]nlike Webster Bivens, they are not without recourse"); *Doe*, 683 F.3d at 396-97.

The same can be said of defendants' invocation of the Torture Victim Protection Act, which authorizes United States residents to sue foreign officials for abusive treatment under color of foreign law. 28 U.S.C. § 1350 Note. Defendants and the concurrence, Conc. Op. at 3-4, assert that the Torture Victim Protection Act's damages remedy for United States residents harmed by foreign officials implies that Congress considered and eschewed a parallel remedy for the same harms inflicted by United States agents. But that statute may well reflect Congress's awareness that, against United States agents, a remedy already exists under *Bivens*.[2] Neither defendants nor my concurring colleague offer any reason why we should infer that Congress's creation of a new remedy against foreign officials communicates its disapproval of the sole available remedy for torture of a United States citizen at the hands of United States nonmilitary agents. Their position

---

[2] In the Detainee Treatment Act of 2005, Congress enacted a limited, good-faith immunity provision shielding United States agents from damages liability in lawsuits brought by alien detainees. *See* 42 U.S.C. § 2000dd-1(a). Such immunity further hints that Congress contemplated that United States agents would face some kind of liability in United States courts when they mistreat their own citizens. *See Vance*, 701 F.3d at 219-20 (Hamilton, J., dissenting).

appears to be that if Kenyan or Ethiopian officials had worked alongside United States agents to torture Meshal, Congress would have wanted him to have a remedy in United States courts against the foreign agents under the Torture Victim Protection Act, but to have no chance of any parallel relief against the Americans inflicting the same torture. That inference is counterintuitive, to say the least.

The executive branch in fact publicly insists that victims of arbitrary detention or torture, both of which Meshal alleges, *do* have a remedy under our law. The remedy the government touts is *Bivens* litigation in federal court. The Convention Against Torture and other treaties prohibit the United States from engaging in torture, forced disappearances, and arbitrary detentions.[3] As the State Department acknowledged in 2014, the United States is bound by the terms of the Convention Against Torture for actions committed either domestically or abroad, whether

---

[3] *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 2(1), Dec. 10, 1984, S. Treaty Doc. 100-20 (1988), 1465 U.N.T.S. 85 ("Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction."); Comm. against Torture, General Comment No. 2 on Implementation of Article 2 by States Parties, U.N. Doc. CAT/C/GC/2, at ¶ 16 (Jan. 24, 2008) (construing "any territory" language in Convention Against Torture to include "other areas over which a State exercises factual or effective control"); International Covenant on Civil and Political Rights, art. 7, Dec. 16, 1966, S. Exec. Doc. C, D, E, F, 95-2 (1978), 999 U.N.T.S. 171 ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); Geneva Convention Relative to the Protection of Civilian Persons in Time of War, arts. 3, 32, 147, Aug. 12, 1949, 75 U.N.T.S. 287 (prohibiting cruel and inhuman treatment and torture).

during a time of conflict or peace.[4] Both the Convention Against Torture and the International Covenant on Civil and Political Rights (ICCPR) obligate the United States to provide remedies, including "compensation," for violations of their respective guarantees.[5] In 2006, the State Department assured the United Nations Committee Against Torture that victims of torture can sue United States officials for damages under the Constitution and cited *Bivens* to support that point. *See* United States Written Responses to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006), *available at* http://www.state.gov/j/drl/rls/68554.htm; *see also Vance*, 701 F.3d at 208-09 (Wood, J., concurring in judgment); *id.* at 219 (Hamilton, J., dissenting); *Arar v. Ashcroft*, 585 F.3d 559, 619 (2d Cir. 2009) (en banc) (Parker, J., dissenting).

Denying Meshal the recourse that the United States has asserted he has—the ability to bring a *Bivens* action—leads to an inexplicable result: civil remedies are available to most victims of torture, *except* a United States citizen tortured by United States agents abroad. An American subjected to

---

[4] Comm. Against Torture, Concluding Observations on the Third to Fifth Periodic Reports of United States of America, U.N. Doc. CAT/C/USA/CO/3-5 (Nov. 20, 2014), at ¶¶ 5, 10, 14 (noting United States official policy that "U.S. personnel are legally prohibited" under Convention "from engaging in torture or cruel, inhuman" treatment "at all times, and in all places"); *see also* CAT, art. 2(1); ICCPR, art. 7; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, 2004 I.C.J. 136, ¶ 109 (2004); Human Rights Comm., General Comment No. 31 on the Nature of the General Legal Obligation Imposed on State Parties to the Covenant, U.N. Doc CCPR/C/21/Rev. 1/Add. 13, ¶ 10 (May 26, 2004).
[5] Convention Against Torture, art. 14(1); ICCPR, arts. 2(3), 9(5), 14(6).

arbitrary arrest and coercive interrogation by federal officials within the United States would typically have a civil remedy under *Bivens*. *See* Maj. Op. at 13. The majority leaves open whether a United States citizen abused by federal agents abroad as part of an investigation *not* implicating national security would be able to bring a *Bivens* action and offers no reason why such a suit would be barred. *See* Maj. Op. at 3, 16. A United States citizen tortured by foreign officials could file suit under the Torture Victim Protection Act. *See* 28 U.S.C. § 1350 Note. A foreign citizen tortured by United States officials within the United States could file suit under the Federal Tort Claims Act and the Alien Tort Statute. *See* 28 U.S.C. § 1346(b)(1); *id.* § 1350. And a foreign citizen tortured by American agents acting abroad could seek redress under the Alien Tort Statute or in his nation's courts. Yet, under defendants' view, a United States citizen tortured by American agents acting abroad has no recourse in his own nation's courts. It makes no sense that Congress would have selectively denied to Americans abused abroad by United States agents the remedies it has extended to all others. The far more tenable conclusion is that Congress recognized that citizens already had a remedy under *Bivens* for such wrongs.

The Constitution includes a Bill of Rights because the Framers ultimately recognized that a Congress responsive to the will of the majority would not always adequately protect individual rights that might be unpopular with majorities. *Bivens*, 403 U.S. at 407 (Harlan, J., concurring in judgment) ("[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities."). Adjudication of claims of individual rights has always been the distinctive province of the Article III courts. The genius of *Bivens* is precisely that it fulfilled a rights-protective function that the Framers knew was

unrealistic to leave only with a majoritarian Congress, even while the Court acknowledged Congress's power to displace *Bivens* by crafting an alternative remedy or "comprehensive statutory scheme" in its stead. *See Schweiker*, 487 U.S. at 424-27; *Bush*, 462 U.S. at 388. Because Congress has not done so here, it has provided no ground for dismissing Meshal's *Bivens* claims.

## B.

Our second task in considering whether Meshal may proceed with his *Bivens* claim is to "make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation," *Wilkie*, 551 U.S. at 550 (internal quotation marks omitted), in "the absence of affirmative action by Congress," *Carlson*, 446 U.S. at 18 (quoting *Bivens*, 403 U.S. at 396). The majority concludes that two factors counsel decisively against recognizing a remedy here: foreign policy and national security concerns. Maj. Op. at 16-18. Defendants have not persuasively shown that either of those factors precludes a *Bivens* action in the circumstances alleged here. Moreover, there is no reason to conclude that a federal district court could not resolve whatever national security concerns might arise.

## 1.

The fact that the conduct Meshal complains of occurred abroad should not vitiate all remedy here. Defendants point to allegations that they harmed Meshal during an investigation "allegedly undertaken jointly with foreign government officials, and while plaintiff was detained by foreign governments." Appellee Br. 21. It is not clear why those

facts, although potentially relevant to how his lawsuit would need to be litigated and managed, *see infra* Part II.B.4, should foreclose the suit. United States law enforcement cooperation with foreign governments around the world has become commonplace. Defendants have not explained how litigation of Meshal's claim would pose foreign policy difficulties. *See* J.A. 13-14; Oral Arg. Tr. at 30 (defendants' counsel referring generally to "our relationship with foreign governments" as the sensitive national security issue raised by Meshal's claims).

Our government's power is defined and limited by the Constitution. "It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government." *Reid*, 354 U.S. at 6. Fidelity to the Constitution should have prevented the FBI's alleged mistreatment of Meshal in Kenya, Somalia, and Ethiopia. Judicial recognition of a claim against those nonmilitary law enforcement officers for having acted in ways long known to be contrary to the Constitution cannot fairly be condemned as "courts . . . *unilaterally* recogniz[ing] new limits that restrict officers' wartime activities." *Cf.* Conc. Op. at 5 (emphasis in original).

In denying Meshal a remedy under *Bivens*, the majority contends that the fact that Meshal's mistreatment occurred outside the United States is a "special factor" counseling against a constitutional damages claim. *See* Maj. Op. at 3, 15-17; Conc. Op. at 3-4 (describing the foreign location of the alleged abuse as the "[m]ost important[]" factor). The court

relies for support on the presumption against extraterritorial application of statutes. *See* Maj. Op. at 15-16 (citing *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). It is well established that Congress has the power to regulate actions of United States citizens outside the territory of the United States and, given the proliferation of transnational conduct, it increasingly does so. The presumption sets only a default rule of statutory construction to aid courts in determining whether Congress intended to legislate with respect to foreign occurrences. *See Kiobel*, 133 S. Ct. at 1665; *Morrison*, 561 U.S. at 255. However, that presumption has no relevance to Meshal's *Bivens* claims to enforce constitutional provisions that all agree apply abroad, especially given that the very genesis of *Bivens* lies in the acknowledged inactivity of Congress.

Even if we were to assume an analogue to the presumption against statutory extraterritoriality for *Bivens* claims, it would be inapposite here because the factors that animate such a presumption are absent. Entertaining Meshal's suit poses no risk of "impos[ing] the sovereign will of the United States" onto conduct by foreign officials in a foreign land. *Kiobel*, 133 S.Ct. at 1667. Application of the United States Constitution to govern interactions between Americans would not control the subjects of an independent sovereign or clash with its law, sending the controversial message that United States law "rule[s] the world." *Cf. id.* at 1664 (*quoting Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). This case involves pursuit of purely retrospective relief by *our* citizen under *our* Constitution against *our* government's criminal investigators. The Supreme Court in *Kiobel*—a case by aliens against foreign defendants to enforce international norms—noted the inapplicability of the presumption against extraterritoriality

when overseas conduct touches and concerns the United States with sufficient force. *See id.* at 1669; *see also Morrison*, 561 U.S. at 264-65. Meshal's claims powerfully touch and concern the United States. Defendants have failed to show that any other nation has any conflicting interest in this case or that our foreign relations would be affected were it to proceed.

Defendants relatedly assert that adjudicating Meshal's allegations that defendants at times worked together with foreign agents to detain and transport Meshal requires federal courts to intrude on foreign justice systems and would upset diplomatic relations. Appellee Br. at 21, 24-26; s*ee* Maj. Op. at 18-19. But we have rejected the position that the cooperation of foreign law enforcement with United States agents renders a claim too sensitive to adjudicate: "[T]eaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the United States officials' unlawful acts." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1542-43 (D.C. Cir. 1984) (en banc), *rev'd on other grounds*, 471 U.S. 1113 (1985); *cf. also Johnson v. Eisentrager*, 339 U.S. 763, 795 (1950) (Black, J., dissenting) ("The Court is fashioning wholly indefensible doctrine if it permits the executive branch, by deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive's illegal incarcerations."); *Abu Ali v. Ashcroft*, 350 F.Supp.2d 28, 50, 54 (D.D.C. 2004) (circumstances in which "a citizen is allegedly being detained at the direction of the United States in another country without any opportunity at all to vindicate his rights" amount to "an exceptional situation that demands particular attention to the rights of the citizen"). Many of the Guantanamo detainees were captured by foreign governments and handed over to the United States, yet courts regularly review the facts

and circumstances of the detainees' capture and detention when they adjudicate habeas claims. *See Rasul v. Bush*, 542 U.S. 466, 470-72, 483-84 (2004); *see, e.g.*, *Anam v. Obama*, 696 F. Supp. 2d 1, 5-7 (D.D.C. 2010).

Our court has identified foreign policy implications as potential "special factors" in cases involving foreign plaintiffs but has specified that such concerns are removed when the plaintiff is a United States citizen. In *Doe*, we acknowledged that the plaintiff's "United States citizenship does remove concerns . . . about the effects that allowing a *Bivens* action would have on foreign affairs" even as we declined on other grounds to recognize a *Bivens* claim against the Secretary of Defense by a United States-citizen military contractor in Iraq. 683 F.3d at 396; *cf. Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208-09 (D.C. Cir. 1985) (noting, in special-factors analysis of Nicaraguans' *Bivens* challenge to United States' support of the Nicaraguan Contras, the "danger of foreign citizens using the courts . . . to obstruct the foreign policy of our government").

The majority cites *Munaf v. Geren*, 553 U.S. 674, 702 (2008), for the broad proposition that United States courts may not "second guess executive officials operating in foreign justice systems," Maj. Op. at 19, but that case does not support defendants' foreign-policy objection to Meshal's *Bivens* claims. The Court in *Munaf* unanimously held that United States citizens held by multinational forces have a right to seek habeas corpus relief in United States courts, 553 U.S. at 686-88, notwithstanding that the participation of cooperating foreigners in the circumstances of confinement might be exposed. *Munaf* also concerned a contest over which of two sovereigns should prosecute criminal suspects of interest to both—a contest absent here, where no prosecution occurred and no other sovereign has claimed an

interest in Meshal's civil case.  *See id.* at 697-98.  The Supreme Court's conclusion—that the United States government's decision not to "shelter [American] fugitives from the criminal justice system of the sovereign with authority to prosecute them" was beyond judicial review, *id.* at 705—has no relevance here.  It fails to provide even indirect support for defendants' much broader contention that a "foreign policy" factor weighs against *any* adjudication of rights abuses arising from investigations involving international cooperation.

**2.**

Defendants also have not shown how the "special factor" of national security prevents recognition of a *Bivens* claim here.  *See* Oral Arg. Tr. at 23 (defendants' counsel claiming that it "is the mere prospect of [national security related] litigation inquiry that raises" national security sensitivities).  The executive and legislative branches have primary authority over national security matters, but their authority is not entirely insulated from the courts, which play a vital role in protecting constitutional rights.  The Supreme Court has long "made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens," and underscored that, "[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi*, 542 U.S. at 536.  Because "[n]ational security tasks . . . are carried out in secret . . . , it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985).  Courts must take care in accepting assertions of necessity based on national security,

because, as the Supreme Court has observed, "the label of 'national security' may cover a multitude of sins." *Id.* at 524.

The law enforcement investigations in *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), were at least as related to the investigation of suspected terrorism as the investigation at issue here, but the Second Circuit found no bar to *Bivens* claims. *See id.* at 233-37. The *Turkmen* plaintiffs were detained in the wake of the September 11th attacks and held until the government could clear them of any involvement with terrorism. *Id.* at 226-27. The fact that the investigation concerned terrorism did not preclude the court from recognizing a *Bivens* remedy. The court acknowledged that "[i]t might well be that national security concerns motivated the Defendants to take action, but that is of little solace to those who felt the brunt of that decision. The suffering endured by those who were imprisoned merely because they were caught up in the hysteria of the days immediately following 9/11 is not without a remedy." *Id.* at 264. The national security character of the investigation was not dispositive there, nor should it be here.

I appreciate the majority's efforts to cabin its holding to cases touching on national security *and* arising abroad. *See* Maj. Op. at 3, 16-17; *see also* Oral Arg. Tr. at 28, 30 (government disclaiming any rule barring all *Bivens* claims involving counter-terrorism investigations, or all claims based on overseas conduct). But I fear that relying on general national security concerns unconnected to military operations goes too far toward eliminating *Bivens* altogether. On its own, national security is a malleable concept. According to one scholar who exhaustively canvassed the field, "[d]espite its appearance throughout history and its use in relation to statutory authorities . . . 'national security' is rarely defined," and when Congress and the executive branch define it, they

do so broadly; the Supreme Court, for its part, "has acknowledged that the term is frustratingly broad, [and that it gives] rise to important constitutional concerns." Laura K. Donohue, *The Limits of National Security*, 48 AM. CRIM. L. REV. 1573, 1579-84 (2011). Defendants provide no principle limiting their proffered "national security" rationale for defeating *Bivens* liability and shielding federal agents from constitutional accountability. The boundlessness of their position is particularly problematic when "[n]o end is in sight" to the war against terrorism. Conc. Op. at 1. Defendants' open-ended invocation of "national security" to defeat *Bivens* is unprecedented.

All of the cases defendants cite as dismissing *Bivens* claims for national security reasons are readily distinguishable from this one as involving the military. *See Doe*, 683 F.3d 390; *Vance*, 701 F.3d 193; *Lebron*, 670 F.3d 540. Both *Doe* and *Vance* concerned abuses allegedly committed by military officials and challenged military decisions about operations in the theater of war. *Doe*, 683 F.3d at 392; *Vance*, 701 F.3d at 195-96, 199. Those decisions hinged, in part, on the fact that the plaintiffs were the functional equivalent of members of the armed services. For example, plaintiff Doe was a defense contractor detailed to a Marine unit on the Iraqi-Syrian border who was detained by the military and determined by a Detainee Status Board to be a threat to the Multi-National Forces in Iraq. *See Doe*, 683 F.3d at 391-92. Although Doe was "a contractor and not an actual member of the military," we saw "no way in which this affects the special factors analysis" of *Stanley* and *Chappell*, which was based on the exclusive system of military justice and discipline. *See Doe*, 683 F.3d at 393-94. Notably, in *Doe*, we referred collectively to the "military, intelligence, and national security" aspect of the case, never invoking "national security" alone or as it might relate to a criminal investigation. *Id.* at 394. *Vance*,

too, involved claims of military contractors "performing much the same role as soldiers." 701 F.3d at 198-99. They were detained by military personnel in a combat zone on suspicion of supplying weapons to groups opposed to the United States. The Seventh Circuit refused to recognize a *Bivens* remedy for their claims, reasoning that "[t]he Supreme Court's principal point was that civilian courts should not interfere with the military chain of command." *Id*. at 199.

In *Lebron*, plaintiff Jose Padilla was "convicted of conspiring with others within the United States to support al Qaeda's global campaign of terror" before he sued military policymakers and military officers for his prior military detention as an enemy combatant. 670 F.3d at 544. Although Padilla was neither a service member nor a contractor functioning as one, the defect in his suit, as in *Doe* and *Vance*, was that he sued the military and his claims threatened to "interfere[] with military and intelligence operations on a wide scale." *Id*. at 553.

Meshal's suit does not arise out of or seek to scrutinize military service or military activity—he is not a service member or military contractor nor is he challenging any conduct of military officials. He was detained by FBI agents during the course of a national-security related law enforcement operation. Unlike its treatment of *Bivens* claims arising from and challenging military actions, the Supreme Court has never hesitated to recognize the viability of a damages suit against federal agents engaged in law enforcement activities or responsible for supervising prisoners. *Compare Chappell*, 462 U.S. at 300, *with Bivens*, 403 U.S. 397-98, *and Carlson*, 446 U.S. at 17-19.

**3.**

Even accepting that the intersection of foreign policy and national security concerns might sometimes amount to "special factors" counseling decisively against a *Bivens* claim, defendants have failed utterly to explain why those factors should be dispositive here. Defendants' contention that litigating Meshal's claims could jeopardize national security has been made in a cursory fashion, and only in legal briefing. Defendants repeatedly assert, for example, that Meshal's suit would "enmesh the judiciary in the evaluation of national security threats in the Horn of Africa region" and compromise "the substance and sources of intelligence." Appellee Br. 13, 24, 25, 37. That is insufficient. The scope or urgency of the national security threat in the Horn of Africa has not been shown to be incompatible with remedying violations of Americans' Fourth and Fifth Amendment rights.

The government's assertion of national security interests here is quite different from the assertion that persuaded the Fourth Circuit in *Lebron* to decline to recognize a *Bivens* claim. There, the court noted that Congress and the executive had acted in concert in support of the power over military affairs that constituted a "special factor." *Lebron*, 670 F.3d at 549. Congress enacted the Authorization for the Use of Military Force, and the President formally designated Padilla as an enemy combatant pursuant to that authorization. *Id.* Here, no designation was made, and no military power asserted. The concurrence characterizes FBI activities in foreign countries as part of an "integrated war effort" under the national security umbrella of the President's war power, and suggests that defendants were privileged to act as they did because they "suspected that Meshal was an al Qaeda terrorist." Conc. Op. at 1. But defendants do not claim that

they acted pursuant to presidential war powers, nor have they provided any grounds for treating Meshal as a terrorist.

If Article III judges must sometimes cede our rights-protective role in deference to the political branches on matters of national security, we should do so only with a responsible official's authoritative and specific assurance of the imperative of doing so. "[H]istory and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse . . . ." *Hamdi*, 542 U.S. at 530. Not every Justice Department lawyer assigned to represent individual defendants sued under *Bivens*, *see* 28 C.F.R. § 50.15, has the authority to invoke the prerogatives of the Commander in Chief.

Before declining to recognize a cause of action because of national security concerns, the court should require the government to provide a concrete, plausible, and authoritative explanation as to why the suit implicates national security concerns. That judges cannot "forecast" on our own whether or how this suit might affect national security, *see* Maj. Op. at 19, only underscores why we must require that the government take responsibility for invoking any such rationale. If this case indeed raises national security concerns, our law provides the United States with the opportunity to advance them, and gives courts more nuanced and focused ways to address such concerns.

In order to invoke the state secrets evidentiary privilege, for example, the head of the department with control over a matter must personally consider the issue and make a formal claim of privilege. *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953). Courts give careful scrutiny to such assertions. *See, e.g.*, *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("Simply saying 'military secret,'

'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege. Sufficient detail must be—and has been—provided for us to make a meaningful examination."). Here, by contrast, defendants have provided no affidavit or certification from a high-level government official explaining how Meshal's suit would implicate national security. Defendants' broad claim that this case implicates national security is entirely unsupported and conjectural. It does not justify refusing to recognize a *Bivens* claim here.

**4.**

If Meshal were permitted to press his claim, it is entirely possible that during the proceedings a national-security related issue would arise, and that such an issue might prove to be an obstacle to the suit. But that is no reason to halt his suit at the threshold. As the majority notes, Maj. Op. at 17, defendants' counsel at argument was unable to explain how litigating Meshal's claim might reveal national security information or be insusceptible of management through the many other doctrines designed to enable litigation consistent with national security interests. *See* Oral Arg. Tr. at 23, 25.

Federal courts frequently decide cases raising national security issues and are well equipped to handle them. Among the responsibilities of Article III courts is the duty to evaluate the factual and legal bases of the government's detention of United States citizens designated as enemy combatants, *Hamdi*, 542 U.S. at 509, 536, to adjudicate habeas petitions brought by enemy combatants detained at Guantanamo Bay, *Boumediene v. Bush*, 553 U.S. 723, 732 (2008), and to decide whether federal agents were engaged in a "joint venture" with foreign law enforcement officials to circumvent *Miranda* warnings, *United States v. Abu Ali*, 528 F.3d 210, 226-28 (4th

Cir. 2008). The judiciary has a wide range of tools to address national security concerns as they arise during the course of a lawsuit. In light of those tools, defendants have failed to show that there is a reason to deny categorically Meshal's constitutional tort claims.

Under the state-secrets privilege, for example, the government can withhold information from discovery if disclosure of that information would imperil national security or foreign policy. *See, e.g.*, *Reynolds*, 345 U.S. at 7-8; *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982). Once the government properly invokes the privilege, a plaintiff cannot defeat it even if his suit would fail without the privileged material. *See, e.g.*, *Reynolds*, 345 U.S. at 11; *Halkin*, 690 F.2d at 990. The state-secrets privilege is designed precisely to prevent disclosure of information that would impair the nation's defense capabilities or diplomatic interests.

Courts have developed a variety of additional procedures for managing cases that implicate sensitive issues. *See* Federal Judicial Center, *National Security Case Studies: Special Case-Management Challenges* (June 25, 2013) (hereinafter "FJC"). Courts are equipped to evaluate classified and sensitive evidence while maintaining secrecy. Classified or secret evidence is often submitted to courts under seal, and courts can issue opinions without disclosing that evidence. *See, e.g.*, *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C. Cir. 2001) ("We acknowledge that in reviewing the whole record, we have included the classified material. As we noted above . . . we will not and cannot disclose the contents of the record."); *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1220 n.4 (D.C. Cir. 1993) ("[Secret] information has been submitted to the court under seal and cannot be discussed in this opinion."). Court personnel and non-government attorneys may be eligible for

security clearances that permit them to view and use classified documents and materials for purposes of litigating claims touching on national security. *See, e.g.*, *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 595 F. Supp. 2d 1077, 1089 (N.D. Cal. 2009); *see also United States v. Moussaoui*, 591 F.3d 263, 267 (4th Cir. 2010); FJC at 416, 422 (collecting examples). Courts can assign codes or aliases in a case to enable witnesses to testify about secret matters in a way in which the judge, jury, and attorneys will understand, but the public will not. *See* FJC at 407-08. Secure video connections can enable depositions and recorded testimony from witnesses living abroad. FJC at 64, 130-31, 187. Defendants have given no reason to believe that the tools available to courts to respond to such concerns would be inadequate in Meshal's case.

* * *

Constitutional damages remedies hold out hope of redress to survivors of what is sometimes truly horrific abuse at the hands of government agents. Witness this case. Such claims are rarely brought and, due to legal and factual complexities, they almost never succeed. Yet their existence has enormous value. As Judge Easterbrook observed for the *en banc* Seventh Circuit in *Vance*, "[p]eople able to exert domination over others often abuse that power; it is a part of human nature that is very difficult to control." 701 F.3d at 205. The Supreme Court recognized constitutional torts to deter that kind of abuse of power. United States law enforcement is more active internationally today than ever before, increasing the relevance of *Bivens*' remedial and deterrent functions in cases like this one. Because I do not believe that precedent supports eliminating Meshal's suit or that defendants made a showing that any congressional action or special factors should preclude it, I respectfully dissent.